UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| RUSSELL LEBARRON,<br><br>                      Plaintiff(s),<br><br>    v.<br><br>INTERSTATE GROUP, LLC,<br><br>                      Defendant(s). | Case No. 2:19-CV-1739 JCM (DJA)<br><br>ORDER |

Presently before the court is defendant and counter-claimant Interstate Group, LLC's ("Interstate") motion to dismiss or, in the alternative, for summary judgment. (ECF No. 64). Plaintiff and counter-defendant Russell LeBarron responded in opposition (ECF No. 79) to which Interstate replied (ECF No. 82).

Also before the court is Interstate's virtually identical second motion for summary judgment. (ECF No. 83). LeBarron responded in opposition (ECF No. 84) to which Interstate replied (ECF No. 89).

## I.   BACKGROUND

Interstate manufactures enclosed cargo trailers and parts and sells them at its TrailersPlus store in Las Vegas. It hired Russell LeBarron in May 2012 to be a salesman. (Second Am. Compl., ECF No. 58 ¶ 15). LeBarron alleges that the company terminated him in February 2018 while he was in a detox and rehabilitation program for an addiction to prescription drugs in violation of the Americans with Disabilities Act ("ADA"). (*Id.* ¶¶ 30–63).

His termination was also allegedly an interference with his health insurance benefits in violation of the Employee Retirement Income Securities Act ("ERISA"). (*Id.* ¶¶ 64–72).

**James C. Mahan**
**U.S. District Judge**

He also alleges he was wrongfully terminated because Interstate negligently hired or trained and supervised its employees in the requirements imposed by these two statutes. (*Id.* ¶¶ 73–87).

Interstate now moves to dismiss or, in the alternative, for summary judgment on all four of LeBarron's claims. (ECF Nos. 64, 83). It also seeks to limit or bar his recovery based on the affirmative defense of after-acquired evidence of wrongdoing. (ECF No. 83).

## II. LEGAL STANDARD

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Because Interstate relies on depositions, declarations, and facts beyond LeBarron's second amended complaint, its first motion will be treated as a motion for summary judgment. (*See* ECF No. 64 at 2–4). And no matter how the court treats the first motion, Interstate's virtually identical second motion asks only for summary judgment. (ECF No. 83).

Summary judgment is proper when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[1] Fed. R. Civ. P. 56(a). The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986), and to avoid unnecessary trials on undisputed facts. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

When the moving party bears the burden of proof on a claim or defense, it must produce evidence "which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears

---

[1] The court can consider information in an inadmissible form at summary judgment if the information itself would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")).

**James C. Mahan**
**U.S. District Judge**

- 2 -

the burden of proof on a claim or defense, the moving party must "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of [proof] at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party satisfies its initial burden, the burden then shifts to the party opposing summary judgment to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a fact is "material" if it could affect the outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The opposing party does not have to conclusively establish an issue of material fact in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). But it must go beyond the pleadings and designate "specific facts" in the evidentiary record that show "there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. In other words, the opposing party must show that a judge or jury has to resolve the parties' differing versions of the truth. *T.W. Elec. Serv.*, 809 F.2d at 630.

The court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990); *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). The court's role is not to weigh the evidence but to determine whether a genuine dispute exists for trial. *Anderson*, 477 U.S. at 249.

An employee's opposition to an employer's motion for summary judgment in the employment discrimination context is subject to the burden-shifting framework from *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and its progeny. "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against

**James C. Mahan**
**U.S. District Judge**

- 3 -

the [employee] remains at all times with the [employee]." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

"As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. University of California, Davis*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). This "minimal" burden does not even rise to a preponderance of the evidence. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

### III.  DISCUSSION

#### a. Interstate's Two Motions for Summary Judgment

As a preliminary matter, Interstate has moved for summary judgment twice. (ECF Nos. 64, 83). Its arguments in the two motions are virtually identical save for the affirmative defense of after-acquired evidence in the second motion. (ECF No. 83). The second motion can be construed as a supplement to the first one. Supplemental briefing is prohibited without leave of court and may be striken. LR 7-2(g).

Because LeBarron opposes Interstate's second motion on the merits, the court will not strike it and waste time and resources. In addition, Interstate's second motion is supported by depositions conducted *after* it filed its first motion. (Snow Dep., ECF No. 83-3 at 2). With good cause appearing, the court will consider the after-acquired evidence argument in the second motion and the remaining arguments as they are presented in both motions.

#### b. Undisputed Facts

The court finds that these facts are undisputed:

LeBarron last worked at TrailersPlus on January 27, 2018. (ECF No. 64 at 3). He was admitted to Seven Hills Hospital for a detox from January 30 to February 4 and was permitted to work without restrictions beginning on February 8. (ECF No. 64-1 at 105).

Throughout LeBarron's time away from work, his wife Stacie texted with his direct supervisor and store manager Wes Smith. (*Id.* at 96). On February 2, Stacie texted Smith asking: "Does [Russ] need to cooperate to let them know how long he will be out?" (*Id.* at 96). Smith responded: "Hey Stacie, I need to know what Russ has planned for work. My

boss says we need to get some paperwork stating where he is and how long he is expected to be there." (*Id.* at 97).

Their next exchange was five days later on February 8.  Smith texted: "Hey Stacie, do you know what Russ has planned for work? [Interstate district manager Alex Mandujano] wants to know if we need to hire someone else. I have text Russ and called him." (*Id.* at 98). LeBarron never received Smith's texts or calls because he had checked into Hope Canyon Recovery Center in San Diego on February 5 after his discharge from a detox at Seven Hills Hospital and could not access his phone.  (LeBarron Dep., *Id.* at 33).

Stacie responded to Smith that same afternoon: "[Russ] said someone should be calling for him to use his FMLA! I will call when I'm on break to find out, sorry about this but he will be out for 30 or more days." (*Id.* at 98).  LeBarron later testified that FMLA leave was a suggestion of his counselor at Hope Canyon.  (*Id.* at 34).  Stacie texted Smith again later that same evening: "I have not heard anything from the place he is at. All I know is he can't call out I can't call in and I can't get ahold of anyone but I know who's gonna be out for 30 days far as I know right now." (*Id.* at 98).

Smith responded to Stacie almost immediately: "Okay I did get a letter about 2 hrs ago from [Hope Canyon Recovery]. It just said he will be there for sometime."  (*Id.* at 101). Smith then sent a photo of the letter—signed by LeBarron's case manager at Hope Canyon—which said: "Please note that on the 8th of February 2018, Russell LeBarron was admitted into our care at Hope Canyon Recovery. He will be in our care until further notice. Should you have any further questions please feel free to contact us at the number provided below." (*Id.* at 109).

Six days later on February 14, Interstate district manager Alex Mandujano circulated this internal email:

> Hi All,
>
> I just wanted to get this information out for all to review.
>
> [Sales Consultant] Russ LeBarron has been admitted to a facility for treatment and is not communicating with [TrailersPlus] staff directly. His spouse has informed [Store Manager] Wes Smith that they don't have a specific date of his return to work.

> He has not been working since 01/27/18 which was his last day worked.
>
> Attached is a letter from the facility he has been admitted to stating that he will be in their care until 'further notice.'
>
> I felt [sic] important to get this information out as Russ takes advantage of [TrailersPlus] medical insurance I called out to his spouse to get some kind of update from her she did not answer so I left a message and will update if/when I hear back.
>
> Thank you.

(*Id.* at 108). LeBarron was terminated the very next day as a quit. (*Id.* at 110). Smith texted Stacie a few weeks later on February 27 that her husband had to be let go "on the books for insurance reasons. But once he is ready they put him down as a rehire when he comes back." (*Id.* at 99).

### c. Failure to Accommodate

To establish a prima facie failure to accommodate claim under the ADA, the employee must show that (1) he is disabled within the meaning of the ADA, (2) he is a qualified individual that can perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability.[2] *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citing 42 U.S.C. § 12112(a), b(5)(A)).

"[O]nce an employee requests an accommodation . . . the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002); *see also* 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(o)(3). To survive summary judgment, the employee must identify a facially reasonable accommodation. *Dark v. Curry Cnty.*, 451

---

[2] A "reasonable accommodation" does not include exemptions from essential functions of a job. *See* 29 C.F.R. § 1630.2(o)(2)(ii). Essential functions of a job are "fundamental job duties" and not "marginal functions of the position." *Id.* § 1630.2(n)(1). A function can be essential for many reasons, including whether the job exists to do the function, the "limited number of employees available" who can do the function, and if the function is "highly specialized." *Id.* § 1630.2(n)(2). Evidence of whether a function is essential includes the employer's judgment, the job description, the time spent on the function, and the consequences of not doing the function. *Id.* § 1630.2(n)(3).

**James C. Mahan**
**U.S. District Judge**

- 6 -

F.3d 1078, 1088 (9th Cir. 2006).  And the court "should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation."  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999)

"A leave of absence for medical treatment may be a reasonable accommodation under the ADA."  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135 (9th Cir. 2001) (citing 29 C.F.R. 1630 app. § 1630.2(o)).  However, the ADA does not require "an indefinite, lengthy, unpaid leave of absence" especially when "the employer does not know when the employee will be able to return to duty."  *Norris v. Allied–Sysco Food Servs., Inc.*, 948 F.Supp. 1418, 1438–39 (N.D. Cal. 1996), *aff'd sub nom. Norris v. Sysco Corp.*, 191 F.3d 1043 (9th Cir. 1999).  In other words, "[r]ecovery time of an unspecified duration may pose an undue hardship, where the employee 'cannot state when and under what conditions he could return to work at all.' "  *Farran v. First Transit, Inc.*, No. 2:11-cv-961-JAD-CHW, 2014 WL 496927, at *8 (D. Nev. Feb. 6, 2014) (quoting *Dark*, 451 F.3d at 1090).

Interstate moves for summary judgment on two grounds.  First, LeBarron admitted he could not be at the store in February 2018 to perform the essential function of a salesman—selling trailers and parts—which made him an unqualified individual under the ADA.  (ECF No. 64 at 6; ECF No. 83 at 10–11).  This argument is foreclosed by *Nunes* which held that if medical leave is a reasonable accommodation, "then [an employee's] inability to work during the leave period would not automatically render her unqualified."  *Nunes*, 164 F.3d at 1247.

Second, Interstate contends that LeBarron requested indefinite leave which is an unreasonable accommodation as a matter of law.  (ECF No. 65 at 7).  In fact, "Interstate kept his job open and did not replace him until he sought an indefinite leave of absence."  (ECF No. 64 at 8).  "Not terminating LeBarron three days after he stopped working" per company policy and "holding his job open until February 15" were accommodations.  (ECF No. 82 at 4).

**James C. Mahan**
**U.S. District Judge**

But the record does not undisputedly show that LeBarron requested indefinite leave. His wife Stacie texted his direct supervisor Wes Smith that he would be "out for 30 days far as I know right now" on the evening of February 8, 2018. (ECF No. 64-1 at 98). About a week later, Interstate terminated LeBarron while he was still in a treatment program. (*Id.* at 110). Yet Interstate paints Stacie as rather uncommunicative during her husband's absence from work. (ECF No. 82 at 1–3). And it claims "there was no reason for Interstate to credit Stacie over [Hope Canyon Recovery Center] who communicated directly with Interstate and said LeBarron would be out until further notice." (*Id.* at 8).

Although it is a close call, this determination is better left to a factfinder. Or in the words of LeBarron: a reasonable factfinder "could easily conclude that Interstate received any required notice" of the "expected duration" of his impairment yet terminated him soon after. (ECF No. 79 at 13 (citing *Larson v. United Nat. Foods W. Inc.*, 518 F. App'x 589, 591 (9th Cir. 2013)).

And hindsight supports LeBarron's contention that thirty days was, in fact, a good estimate of the expected duration of his impairment. He avers that he did not use any drugs during his detox and rehabilitation treatments and "remains sober to this day." (LeBarron Decl., ECF No. 84-1 at 3). *Cf. Farran*, 2014 WL 496927, at *6 (noting that hindsight validated an employer's choice to disregard a union's prediction that its employee would return to work in several weeks because the employee ultimately needed nine months of leave).

It is also genuinely disputed whether thirty-days leave would impose an undue hardship on the employer. Interstate says LeBarron "worked in a very small workplace" with four salesman and it "needed to hire another salesperson if he was going to be unavailable" especially given the historical increase in sales in the month of March. (ECF No. 64 at 7). The court cannot say these "possible hardships" made LeBarron's purported 30-day leave request undisputedly unreasonable. *Nunes*, 164 F.3d at 1247. Again, this "weighing of the risks and alternatives" is better left to a factfinder. *Id.*; *see also EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010) ("Whether a reasonable

accommodation exists is ordinarily a question of fact for a jury." (citing *Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999))).

Because it is genuinely disputed whether LeBarron requested indefinite leave and because thirty-days leave would be a facially reasonable accommodation, summary judgment for Interstate on LeBarron's failure to accommodate claim is DENIED.

### d. Retaliation

To establish a prima facie retaliation claim under the ADA, the employee must show that "(1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004). The employee's protected activity includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute like requesting a reasonable accommodation. *Id.* at 450; *see also Denning v. Washoe Cty.*, No. 3:17-cv-00463-MMD-WGC, 2018 WL 4286185, at *4 (D. Nev. Sept. 7, 2018), *aff'd sub nom. Denning v. Cty. of Washoe*, 799 F. App'x 547 (9th Cir. 2020). An adverse employment action is "any action reasonably likely to deter employees from engaging in protected activity." *Pardi*, 389 F.3d at 850 (quoting *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000)). "If the employee establishes a prima facie case, [he] will avoid summary judgment unless the employer offers legitimate reasons for the adverse employment action, whereupon the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual." *Id.* at 849.

Interstate moves for summary judgment on three unpersuasive grounds. First, it contends that LeBarron did not oppose an act or practice that violates the ADA. (ECF No. 64 at 8; ECF No. 83 at 13). But, as aforementioned, requesting a reasonable accommodation is a protected activity. Second, Interstate wrongly contends that LeBarron seeks only compensatory and punitive damages which are unavailable for ADA retaliation claims. (ECF No. 64 at 9; ECF No. 83 at 14). He prays for equitable relief in his second amended complaint. (ECF No. 58 ¶ 87). And this argument conflicts with Interstate's after-acquired evidence affirmative defense which seeks to limit or bar recovery of frontpay and backpay

which are equitable remedies. *See Melone v. Paul Evert's RV Country, Inc.*, No. 2:08-cv-00868-GWF, 2011 WL 6780877, at *5 (D. Nev. Dec. 27, 2011); *see also* 42 U.S.C. § 2000e-5. Third, Interstate contends that it offered to rehire LeBarron. (ECF No. 64 at 8; ECF No. 83 at 13). Without any supporting caselaw, the court will not hold that a possible retaliatory termination can be cleansed by an offer to rehire the employee upon their return from medical leave.

Putting aside Interstate's unpersuasive arguments, LeBarron arguably establishes a prima facie case of retaliation. His wife texted his direct supervisor that he would be "out for 30 days far as I know right now" on the evening of February 8, 2018. (ECF No. 64-1 at 98). About a week later, Interstate terminated him. (ECF No. 64-1 at 110). Interstate's purported legitimate reason for terminating him is that indefinite leave is an unreasonable accommodation as a matter of law. (ECF No. 64 at 8; ECF No. 83 at 13).

But again, whether LeBarron requested thirty-days leave or indefinite leave is in genuine dispute given the competing letter from his treatment provider and the text messages from his wife. Put differently, Interstate's best argument for summary judgment is that LeBarron requested indefinite leave. Because this material fact is genuinely disputed, summary judgment for Interstate on LeBarron's retaliation claim is DENIED.

### e. Section 510 ERISA Interference

Section 510 of ERISA provides that:

> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under [a qualifying plan] . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. The "prototypical" claim covered by the statute is terminating an employee right before his pension vests. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990). Courts use the aforementioned *McDonnell-Douglas* burden-shifting framework "for assessing an employer's liability for discriminatory interference with a plaintiff's exercise of protected rights under section 510" when there is no direct evidence of discrimination. *Lessard v. Applied Risk Mgmt.*, 307 F.3d 1020, 1025 (9th Cir. 2002).

To establish a prima facie case of interference with ERISA rights, the employee must show that (1) he or she participated in statutorily protected activity, (2) suffered a statutorily prohibited action, and (3) there was a causal relationship between the two. *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989). In addition, the employer must have *specifically intended* to interfere with the employee's ERISA rights. *See id.* at 881. And "speculative allegations are insufficient to establish an employer's specific intent." *Wimberly v. Reliance Standard Life Ins. Co.*, No. 2:11-cv-00430-PMP, 2011 WL 2847583, at *4 (D. Nev. July 14, 2011).

As an initial matter, LeBarron's ostensible direct evidence of discrimination is rather non-direct. (ECF No. 79 at 17; ECF No. 84 at 21). Even when viewed in the light most favorable to him, Smith's single text message to his wife that was terminated for "insurance reasons" cannot be reasonably viewed as "written, authenticated evidence of Interstate's specific intent to interfere with LeBarron's entitled benefits." (ECF No. 79 at 17). The full text message exchange suggests that Smith intended to rehire him "when he comes back" and that he believed the company was merely complying with the requirements of its health insurance plan. (ECF No. 64-1 at 99).

To that end, regional manager Clay Baillie avers that "in a non-FMLA location an employee can remain on the group plan as an active employee only if the employee comes back to work in the same month. Russell LeBarron never came back to work in [February 2018]. As required by our health plan, he was offered COBRA." (Baillie Decl., ECF No. 64-2 at 2). While LeBarron rightfully points out that Baillie's declaration may be self-serving, (ECF No. 79 at 17; ECF No. 84 at 21), it is nonetheless consistent with the notes on the exit checklist completed on his termination date and the actual rules of the company's health insurance plan in effect at the time. (ECF No. 83-1 at 78; ECF No. 79-10 at 2).

Put plainly, LeBarron did not work in February 2018, Interstate believed he could not stay on the health insurance plan as a result, and its belief turned out to be correct. Thus, even assuming LeBarron establishes a prima facie case, the company offers a legitimate nondiscriminatory reason for its conduct. *Accord Barnhardt v. Open Harvest Co-op.*, 742

1  F.3d 365, 371 (8th Cir. 2014) ("[The employer] reasonably could have concluded that [the
2  employee] did not actively work during the month of August and that her coverage thus
3  terminated as of July 31. While this interpretation might be incorrect, it constitutes a
4  legitimate, non-discriminatory justification for [the employer's] conduct.").

5       Now the burden shifts back to LeBarron to show a genuine dispute over whether
6  Interstate's proffered reason is pretext for a specific intent to deny him health insurance
7  benefits. He has not met his burden. He offers no proof of any incriminating timing or
8  "economic incentive" the company had to end his health insurance benefits. *See Barnhardt*,
9  742 F.3d at 372 (discussing "economic incentives" and "temporal proximity" as evidence of
10  pretext); *Kimbro*, 889 F.2d at 881 (same). In fact, Interstate CEO Michael Snow testified to
11  the contrary. (Snow Dep., ECF No. 83-3 at 87 ("Our investment into training and selecting
12  an employee is thousands and thousands of dollars. The cost of health insurance, our
13  payment is 60, 80 dollars a month. To talk about terminating somebody for insurance reasons
14  [ ] it's not in any universe I can understand.")). And an email from district manager Alex
15  Mondujano to various management that described LeBarron as "tak[ing] advantage" of the
16  company's health insurance plan is unpersuasive evidence of animus. (ECF No. 79 at 18;
17  ECF No. 84 at 22 (discussing ECF No. 64-1 at 108)).

18       At best, LeBarron has shown that Snow does not know the ins-and-outs of his
19  company's health insurance plan. (ECF No. 79 at 17; ECF No. 84 at 21). This is not enough
20  to meet his burden to show a genuine dispute over pretext. Because there is no genuine
21  dispute over whether Interstate terminated LeBarron with the specific intent to interfere with
22  his health insurance benefits, summary judgment for Interstate on his ERISA interference
23  claim is GRANTED.

24       **f. Negligent Hiring, Training, and Supervision**

25       LeBarron alleges that Interstate failed to train, hire, and supervise store manager Wes
26  Smith and district manager Alex Mandujano regarding ERISA and ADA requirements which
27  led to his wrongful termination for "insurance reasons." (Second Am. Compl., ECF No. 58
28  ¶¶ 73–87; *see also* ECF No. 79 at 19; ECF No. 84 at 24).

**James C. Mahan**
**U.S. District Judge**

1 Interstate moves to dispose of LeBarron's negligence claim in two ways. First, the claim should be dismissed because "LeBarron does not allege that Interstate had any knowledge that [Mandujano or Smith] had a propensity towards committing unlawful acts against him and because it is undisputed that LeBarron was an at-will employee." (ECF No. 64 at 13; *see also* ECF No. 84 at 17). Second, because neither "Mandujano nor Smith committed an unlawful act in violation of ERISA or the ADA, Interstate is entitled to judgment as a matter of law" on the negligence claim. (ECF No. 64 at 13; *see also* ECF No. 84 at 17).

"As is the case in hiring an employee, the employer has a duty to use reasonable care in the training, supervision, and retention of his or her employees to make sure that the employees are fit for their positions." *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996). A plaintiff must establish that: (1) defendant owed a duty of care to the plaintiff; (2) defendant breached that duty by hiring, retaining, and/or supervising an employee even though defendant knew, or should have known, of the employee's dangerous propensities; (3) the breach was the cause of plaintiff's injuries; and (4) damages. *See id.* "It is an open question whether a claim for negligent hiring, training and supervision under Nevada law requires a plaintiff to make a showing of actual physical harm or a threat thereof." *Persaud v. Universal Health Servs., Inc.*, No. 2:10-cv-02206-ECR, 2011 WL 1743852, at *5 (D. Nev. May 5, 2011).

LeBarron must specifically show "how [his] employer violated its duty." *Reece v. Republic Servs., Inc.*, No. 2:10-cv-00114, 2011 WL 868386, at *11 (D. Nev. Mar. 10, 2011). "Nevada law does not permit the inference that an employer was negligent in training or supervising simply because [its] employees acted in a discriminatory manner." *Id.* Because otherwise, any violations of ERISA or ADA could too easily lead to potential derivative liability for negligent hiring, training, and supervision.

Yet the record lacks evidence showing negligent training or supervision let alone a but-for relationship between negligent training and supervision and LeBarron's termination.

He offers no evidence "perhaps demonstrating to what extent" Smith and Mandujano were or were not supervised. *Reece*, 2011 WL 868386, at *11.

Instead, he argues that "Interstate has no knowledge, facts, or information relating to LeBarron's employment and its resulting obligations to LeBarron under ERISA. Shockingly, Interstate has admitted it is not even familiar with ERISA." (ECF No. 79 at 19; *see also* ECF No. 84 at 24). In support of this conclusory contention, LeBarron offers the individual and Rule 30(b)(6) deposition of regional manager Clay Baillie. (ECF No. 79 at 19; ECF No. 84 at 24). Even when viewed in the light most favorable to LeBarron, Baillie's testimony that he is personally unfamiliar with the ins-and-outs of ERISA is not evidence of insufficient training or supervision. Baillie testified that he and other upper management rely on the company's HR and payroll departments to handle ERISA matters. (Baillie Dep., ECF No. 79-3 at 16–18; *see also* ECF No. 89 at 14 ("Interstate has hired professionals to make sure that it complies with its ERISA obligations.")). LeBarron offers no evidence that these departments were negligently trained or supervised leading up to his termination.

LeBarron's claim may also fail because he has not shown physical harm or a threat of physical harm resulting from Interstate's alleged negligence. *See Reece*, 2011 WL 868386, at *11 (citing *Barnes v. National Council of Juvenile & Fam. Court Judges*, No. 3:10-cv-00528-ECR-RAM, 2010 WL 5102258, *2 (D. Nev. Dec. 3, 2010) (predicting that "the Nevada Supreme Court would explicitly rule that physical harm is necessary for a negligent hiring, retention and supervision claim in Nevada")).

Nonetheless, because LeBarron does not offer evidence of how Interstate specifically breached any duty it might have to train and supervise its employees in ERISA and ADA requirements that caused his termination, summary judgment for Interstate on his negligent hiring, training, and supervision claim is GRANTED.

g. **After-Acquired Evidence**

The affirmative defense of after-acquired evidence "may be applicable if an employer discharges an employee for a discriminatory reason, but then later discovers that an employee's own wrongdoing would have been independent grounds for termination." *U.S.*

*E.E.O.C. v. Wedco, Inc.*, 65 F. Supp. 3d 993, 1012 (D. Nev. 2014).  The employer must establish by a preponderance of the evidence "not only that it *could* have fired an employee for the later-discovered misconduct, but that it *would* in fact have done so."  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996) (emphasis in original).

"This inquiry is focused on the employer's actual employment practices, not just the standards recited in its employee manuals or the actions threatened but not taken. An employer may rely on sworn affidavits from its employees although these may not be enough absent proof that employer discharged other employees for the same infraction, company policy forbidding the conduct, or common sense."  *Sadeh v. Venetian Casino Resort, LLC*, No. 2:10-cv-02224-KJD, 2012 WL 3065442, at *4 (D. Nev. July 27, 2012) (internal citations omitted).

After-acquired evidence "does not protect the employer from liability."  *Wedco*, 65 F. Supp. at 1012.  Rather, it "generally limits an employee's remedy in three significant ways": (1) the employer does not have to offer reinstatement, (2) does not have to pay any frontpay, and (3) only has to pay backpay "from the date of the unlawful discharge to the date the new information was discovered."  *O'Day*, 79 F.3d at 759 (quoting *McKennon v. Nashville Banner Publ'g Co.*, 115 S. Ct. 879, 886 (1995)).

Interstate asserts two after-acquired evidence theories which the court will address in turn.  First, Baillie was told by Smith a day or two after LeBarron's termination that he saw ads on Craigslist and LetGo posted by LeBarron for trailer locks and parts stolen from the TrailersPlus store. (Baillie Dep., ECF No. 83-2 at 115–116).  This one- or two-day period leaves "no window where LeBarron would have been entitled to backpay or any other remedy."  (ECF No. 83 at 8).  If Mandujano, Baillie, or Snow had known that LeBarron was stealing from the company, he would have been terminated immediately.  (ECF No. 89 at 7).

Yet the court does not have to determine whether Interstate *would have* terminated LeBarron because the company purportedly had actual knowledge of his alleged theft yet did not terminate him.  In the words of Interstate: "It is undisputed that in mid-January 2018, Cesar Fernandez and Wes Smith saw ads on Craigslist and LetGo posted by Russell

LeBarron for trailer locks. When confronted, LeBarron 'promised not to do it further.' LeBarron said he 'needed the job.' Wes Smith 'did not want to get LeBarron fired.' " (ECF No. 89 at 2 (quoting Smith Decl., 83-1 at 121)).

The court does not see why it cannot impute Smith's actual knowledge of the alleged theft to Interstate; the company draws a superficial line between Smith and upper management. After all, Smith was LeBarron's direct supervisor and Snow testified that the company's "normal practice" would be for Smith to have "input" in the "ultimate decision" to terminate him. (Snow Dep., ECF No. 83-3 at 71). Because it is genuinely disputed whether Interstate had actual knowledge of LeBarron's alleged theft, summary judgment on his potential recovery based on Interstate's first after-acquired evidence theory is DENIED.

Interstate's second after-acquired evidence theory—which would bar *any* remedy—is that it would not have hired LeBarron if it knew he was terminated from his prior job at Aria Resorts for stealing earrings. (ECF No. 89 at 2). LeBarron was charged with grand larceny and entered a plea of nolo contendere for misdemeanor theft based on this conduct. He received a suspended 60-day sentence and paid $200 in restitution and $400 in fines. (ECF No. 83-1 at 13–14). Interstate says he did not disclose this criminal matter on his employment application. (ECF No. 89).

Snow's declaration (ECF No. 83-3 at 111) alone does not meet Interstate's burden to show that it would have terminated LeBarron if it knew he had stolen from his previous employer. *Accord Van Asdale v. Int'l Game Tech.*, No. 3:04-cv-703-RAM, 2009 WL 4828708, at *10 (D. Nev. Dec. 8, 2009). As aforementioned, Interstate "may rely on sworn affidavits from its employees although these may not be enough absent proof that employer discharged other employees for the same infraction, company policy forbidding the conduct, or common sense." *Sadeh*, 2012 WL 3065442, at *4. And LeBarron's employment application does not suggest he made any affirmative misrepresentations which the application states would be grounds for termination. (ECF No. 83-1 at 61).

James C. Mahan
U.S. District Judge

Because Snow's declaration does not amount to a preponderance of the evidence, summary judgment on LeBarron's potential recovery based on Interstate's second after-acquired evidence theory is DENIED.

## IV.   CONCLUSION

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Interstate's motions for summary judgment (ECF Nos. 64, 83) be, and the same hereby are, GRANTED in part and DENIED in part.  The motions are DENIED as to LeBarron's first and second claims and GRANTED as to his third and fourth claims.

DATED March 26, 2021.

_____
UNITED STATES DISTRICT JUDGE